UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TWYLA BROWN, o/b/o  J.B.,

           Plaintiff,

    -vs-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

           Defendant.
_____

**DECISION and ORDER
No. 1:12-CV-1062(MAT)**

## I.   Introduction

Represented by counsel, Twyla Brown ("Plaintiff") has brought this action on behalf of her infant son ("JB" or "Claimant") pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying JB's application for Supplemental Security Income ("SSI"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

## II.  Procedural Status

On March 12, 2009, Plaintiff protectively filed an application for SSI on behalf of JB, alleging an onset date of March 1, 2009. After the claim was denied, Plaintiff requested a hearing, which was held on February 16, 2011, in Buffalo, New York, before

Administrative Law Judge William R. Pietz ("the ALJ"). T.33-51.[1]
Plaintiff was represented by an attorney. The ALJ issued an
unfavorable decision dated March 9, 2011. T.13-32. On September 4,
2012, the Appeals Council denied Plaintiff's request for review,
making the ALJ's decision the final decision of the Commissioner.
This timely action followed.

### III. Factual Background

On September 16, 2008, when JB was nine-years, ten-months-old,
Plaintiff brought him to a psychiatric clinic due to his
hyperactivity, oppositional behaviors, and occasional suicidal
ideation. T.178, 312-18. Plaintiff related that JB had a history of
aggressiveness toward his younger brother, hyperactivity,
impulsiveness, lying, stealing food, and complaining of being
hungry all the time. T.289. Plaintiff had to watch him constantly.
He was in a 15-1-1 class, was disrespectful to his teachers,
received poor grades, and had been suspended from school on several
occasions. At the time, his Axis I diagnoses were Oppositional
Defiant Disorder ("ODD") and Attention Deficit Hyperactivity
Disorder ("ADHD"). JB began participating in individual and family
therapy and was prescribed medication. Treatment notes and academic
evaluations throughout the relevant period indicate that JB
consistently received violations at school due to his inappropriate

---

[1]

Citations to "T." refer to pages in the certified administrative transcript
filed manually by the Commissioner in connection with her answer to the
complaint.

behavior, was disruptive and inattentive in class, continued to steal and hoard food at home and was grossly overweight, would not bathe or wash himself despite reminders by his mother, and would act out and pick on his younger brother. T.290. The Court has reviewed the entire administrative transcript, including JB's medical, academic, and psychiatric records, and will discuss the evidence further below as necessary.

## IV. Applicable Law

### A.   Standard of Review

A determination by the Commissioner that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence" or when the decision is based upon legal error. See 42 U.S.C. § 405(g). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," a reviewing court may not substitute its judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). However, this deferential standard is not applied to the Commissioner's application of the law. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have [his] disability determination made according to the correct legal principles."

Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

**B.    Legal Standard for Disability Claims by Children**

To qualify as disabled under the Act, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).   By regulation, the Commissioner has promulgated a three-step analysis to determine whether a child is eligible for SSI benefits on the basis of a disability. Encarnacion ex rel. George v. Astrue, 586 F.3d 72, 75 (2d Cir. 2009) (citing 20 C.F.R. § 416.924, et seq.).

First, the ALJ determines whether the child is engaged in "substantial gainful activity." 20 C.F.R. § § 416.924(a), (b). Second, the ALJ considers whether the child has a "medically determinable impairment that is severe," in that it causes "more than minimal functional limitations." Id., § 416.924(c). If a severe impairment is present, the ALJ must then consider whether the impairment "meets, medically equals," or "functionally equals" a presumptively disabling condition listed in the regulatory "Listing of Impairments." Id., § 416.924(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The limitations caused by a child's severe impairment or combination of impairments are evaluated in the context of the

-4-

following six domains of functioning:

    (1) acquiring and using information;
    (2) attending and completing tasks;
    (3) interacting and relating with others;
    (4) moving about and manipulating objects;
    (5) caring for oneself; and
    (6) the child's health and physical well-being.

20 C.F.R. § 416.926a(b)(1). "For a child's impairment to functionally equal a listed impairment, the impairment must 'result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.'" Encarnacion, 568 F.3d at 75 (quoting 20 C.F.R. § 416.926a(a)). An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). A "marked limitation" is an impairment that "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

## V. The ALJ's Decision

The ALJ found that JB has never engaged in substantial gainful

activity and has the following severe combination of impairments: speech/language delays, ADHD, and obesity. T.29. The ALJ found that these impairments impose more than minimal limitations on his functioning. The ALJ found that JB's headaches were well-controlled by medication and no longer lengthy or frequent, making them a non-severe impairment.

With regard to JB's speech/language delays, the ALJ noted that he was consultatively evaluated and found to have a severe receptive language and a moderate expressive language delay. JB's prognosis for improvement was assessed as "good" with continued appropriate interventions, particularly since JB had demonstrated progress and recently was noted to have good intelligibility. In terms of JB's ADHD, the ALJ found that he "receives pharmacotherapy with good results." T.20. The ALJ noted that based on the treatment notes, at least some of JB's weight problems were caused by his medication for ADHD.

The ALJ concluded that JB has "less than marked" limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, Caring for Self, and Health and Physical Well-Being; and no limitations in Moving About and Manipulating Objects. Because JB was not found to have have "marked" limitations in two domains or an "extreme" limitation in one domain and a "marked" limitation in another domain, the ALJ entered a finding of "not disabled."

## VI.  Discussion

Plaintiff contends that the ALJ's decision was not based on substantial evidence and was marred his mischaracterization of the record and misunderstanding of the nature of JB's behavioral disorders.  In particular, Plaintiff asserts that the ALJ erroneously found "less than marked" limitations in these three domains of functioning:  Attending and Completing Tasks, Interacting and Relating with Others, and Caring for Self.

### A.  Attending and Completing Tasks

In the domain of Attending and Completing Tasks, the Commissioner considers the child's ability "to focus and maintain . . . attention," and how well he can "begin, carry through, and finish . . . activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them." 20 C.F.R. § 416.926a(h). A school-age child such as JB is expected to focus attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments. See 20 C.F.R. § 416.926a(h)(2)(iv). The child should be able to, e.g., concentrate on details, change activities or routines without distracting himself or others, and stay on task and in place when appropriate. See id.

On April 24, 2009, JB's fourth-grade special education teacher Linda Tokaz ("Ms. Tokaz"), who had known JB since September 2009,

completed a teacher questionnaire indicating JB was in a room with 10 students to 1 teacher. See T.119-26. In the domain of Attending and Completing Tasks, Ms. Tokaz assessed JB's limitations as follows:

- a "serious" problem, occurring hourly, with (1) paying attention when spoken to directly, (2) sustaining attention during play, (3) focusing long enough to finish an assigned activity or task, (4) refocusing to task when necessary, (5) carrying out single-step instructions, (6) carrying out multi-step instructions, (7) waiting to take turns; and (8) working at a reasonable pace/finishing on time;

- a "very serious" problem, occurring hourly, with (1) changing from one activity to another without being disruptive, and (2) working without distracting self or others;

- an "obvious" problem occurring hourly with organizing his own things or school materials; and

- a "slight" problem, occurring daily, with (1) completing class/homework assignments, and (2) completing work accurately without careless mistakes.

T.121. Ms. Tokaz noted that JB "thinks whispering to himself and others during no talk/independent time is ok." T.121.

On February 15, 2011, JB's sixth-grade teacher, Jennifer Killinger ("Ms. Killinger") completed an assessment, noting that she had known JB since September 9, 2009. T.619. In the domain of Attending and Completing Tasks, Ms. Killinger assessed JB's limitations as follows:

- Changing from one activity to another without being disruptive-a very serious problem occurring hourly;
- Working without distracting self or others-a very

-8-

> serious problem occurring hourly;
>
> • Organizing own things or school materials-a serious problem occurring hourly;
>
> • Completing class/homework assignments-an obvious problem occurring weekly;
>
> • Completing work accurately without careless mistakes-a slight problem occurring weekly;
>
> • Paying attention when spoken to directly-a slight problem occurring daily;
>
> • Focusing long enough to finish assigned activity or task-an obvious problem, no assessment of frequency of occurrence;
>
> • Refocusing to task when necessary-an obvious problem, no assessment of frequency of occurrence;
>
> • Carrying out single-step instructions-an obvious problem, occurring monthly;
>
> • Carrying out multi-step instructions-an obvious problem, occurring monthly;
>
> • Waiting to take turns-no problem;
>
> • Working at reasonable pace/finishing on time-no problem.

T. 621. Ms. Killinger noted that while JB was "on level academically," he was "hinder[ed] from completing assignments" by his behavior, which "ha[d] to be constantly monitored." T.621, 626. Ms. Killinger stated that "[JB] is a complete distraction to his peers," needs constant re-direction from the teacher[,]" T.621, was "extremely impulsive," T.626, and was "often the 'root' of several problems [in the classroom] and [was] extremely disruptive and talkative." T.626. Although there were some areas of improvement

from Ms. Tokaz's 2009 report, it is noteworthy that, according to Ms. Killinger, JB still was having "very serious problems" on an hourly basis changing from one activity to another without being disruptive and working without distracting himself or others.

Relying in large part on his own observations about JB at the hearing (i.e., "[JB] was calm and attentive at the hearing and his mother testified that Strattera has helped [his ADHD] 'a lot[,]'" T.21), the ALJ found that JB had a "less than marked" limitation with regard to the domain of Attending and Completing tasks. The ALJ noted that JB's teacher reported in April 2009 that he "does not keep quiet and that he is a constant distraction to class," and that he had "very serious" and "serious" problems in most areas in this domain. However, according to the ALJ, JB's problems were "clearly the result of the claimant's *choice* to be talkative, as indicated in the teacher's comments[,]" T. (citing Exhibit ("Ex.") 4E) (emphasis supplied). Although the ALJ does not identify the particular comments by Ms. Tokaz on which he relied, it appears that he is referring to Ms. Tokaz's comment that JB "can't and won't keep his mouth closed. He is a constant distraction to class. He has no self-control." T.121. Based on these statements, the ALJ opined that "[t]he claimant's *chosen* behaviors are trivial or otherwise do not rise to the level of severity contemplated in the Diagnostic and Statistical Manual, Fourth Edition (DSM-IV)." T.21 (emphasis supplied). The ALJ later declared that JB's "behavioral

-10-

choices do not constitute medically determinable impairments." T.25.

The ALJ's comments are problematic for multiple reasons. First, by characterizing JB's limitations as merely "choices", the ALJ ignored the medically-recognized symptomatology of ADHD, an impairment that the ALJ deemed to be severe. The ALJ also demonstrated a fundamental misunderstanding of the nature of behavioral disorders. Here, as noted above, JB has been diagnosed with ADHD, Combined Type (ICD-9 Code 314.01), which is characterized by inattention, hyperactivity, and impulsivity that have "persisted for at least 6 months to a degree that is maladaptive and inconsistent with developmental level[.]" Diagnostic and Statistical Manual of Mental Disorders 78-85 (4th Ed. 2000) ("DSM IV"). ADHD, Combined Type is met if both criterion 1A (six or more enumerated symptoms of inattention[2] have been present

---

[2]
The symptoms of inattention listed in the DSM-IV for ADHD, Combined Type, are that the child "[o]ften does not give close attention to details or makes careless mistakes in schoolwork, work, or other activities"; "[o]ften has trouble keeping attention on tasks or play activities"; "[o]ften does not seem to listen when spoken to directly"; "[o]ften does not follow instructions and fails to finish schoolwork, chores, or duties in the workplace (not due to oppositional behavior or failure to understand instructions)"; "[o]ften has trouble organizing activities"; "[o]ten avoids, dislikes, or doesn't want to do things that take a lot of mental effort for a long period of time (such as schoolwork or homework)"; "[o]ften loses things needed for tasks and activities (e.g. toys, school assignments, pencils, books, or tools); "[i]s often easily distracted"; "[i]s often forgetful in daily activities".

for at least 6 months to a point that is disruptive and inappropriate for developmental level) and criterion 1B (six or more enumerated symptoms of hyperactivity-impulsivity[3] have been present for at least 6 months to an extent that is disruptive and inappropriate for developmental level) are met for the past 6 months. See DSM IV, pp. 78-85.  Upon reviewing the diagnostic criteria in the DSM-IV, it is apparent that the behaviors the ALJ characterized as "choices" are actually examples of the main diagnostic features of ADHD itself.  See supra nn. 3 & 4 (citing DSM IV, pp. 78-85). The ALJ's dismissal of JB's symptoms as merely poor behavioral choices amounts to the ALJ "arbitrarily substitut[ing] his own judgment[,]" McBrayer v. Secretary of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983) (citing Grable v. Secretary of HEW, 442 F. Supp. 465, 470 (W.D.N.Y. 1977)), for that of the competent medical professionals who diagnosed JB with ADHD, Combined Type. See Selian v. Astrue, 708 F.3d 409, 419 (2d

---

[3]
     The symptoms of hyperactivity listed in the DSM-IV are that the child "[o]ften fidgets with hands or feet or squirms in seat"; "[o]ften gets up from seat when remaining in seat is expected"; "[o]ften runs about or climbs when and where it is not appropriate (adolescents or adults may feel very restless)"; "[o]ften has trouble playing or enjoying leisure activities quietly"; "[i]s often 'on the go' or often acts as if 'driven by a motor'"; "[o]ften talks excessively". The symptoms of impulsivity are that the child "[o]ften blurts out answers before questions have been finished"; "[o]ften has trouble waiting one's turn"; "[o]ften interrupts or intrudes on others (e.g., butts into conversations or games)".

Cir. 2013) (finding reversible error where "the ALJ improperly substituted her own criteria as to what is necessary to establish a fibromyalgia diagnosis without support from medical testimony".). The ALJ also mischaracterized the teachers' opinions so as to make it appear as though they supported his belief that JB's behaviors are attributable simply to wilfulness rather than to his medically-determinable impairment of ADHD. As Plaintiff argues, JB has a medical diagnosis that accounts for all of the maladaptive behaviors described by his teachers.

Other legal errors affect the ALJ's decision, including his apparent over-reliance on his observations of JB's demeanor during the hearing. As one of his justifications for finding JB's impairments non-disabling, the ALJ observed that JB "was calm and attentive" during the hearing. This amounts to a variant of the disfavored "sit and squirm" test. See Brown v. Commissioner of Social Sec., No. 06-CV-3174(ENV)(MDG), 2011 WL 1004696, at *5 (E.D.N.Y. Mar. 18, 2011) ("The 'sit and squirm' test has been rejected by the Second Circuit as impermissible, and observations by the ALJ of any sort shall be accorded only limited weight, 'since the ALJ is not a medical expert.'") (quoting Spielberg v. Barnhart, 367 F. Supp.2d 276, 282 (E.D.N.Y. 2005) (citing Aubeuf v. Schweiker, 649 F.2d 107, 113 (2d Cir. 1981); other citation omitted)). Without a doubt, an administrative hearing constitutes a "highly structured setting." The "Commissioner's regulations

require the ALJ to consider the effects of a structured or highly supportive setting . . . on the claimant's functioning and, if the claimant's symptoms or signs are controlled or reduced by the structured environment, the ALJ is required to consider the claimant's functioning outside of the highly structured setting." Smith v. Massanari, No. 00-CV-0402, 2002 WL 34242375, at *6 (W.D.N.Y. Mar. 17, 2002) (citing 20 C.F.R. § 416.924c). Neither the law nor the record in this case supports the ALJ's generalization of JB's calm demeanor during the highly structured setting of a legal proceeding to a less structured setting.

In sum, the Court finds that the ALJ's assessment with regard to the domain of Attending and Completing Tasks was not supported by substantial evidence. As outlined above, the educational evidence demonstrated conclusively that JB had very serious difficulties attending to and completing tasks and required significant support to perform such tasks, even within a highly supportive setting. The record evidence establishes a finding of at least a marked impairment with regard to this domain. See, e.g., Perkins ex rel. J.P. v. Astrue, 32 F. Supp.3d 334, 342-43 (N.D.N.Y. 2012) (child claimant's teacher noted that claimant needed an "'extremely long time'" to complete tasks "'even with teacher or student assistance'" and had "obvious" and "very serious" problems in this domain notwithstanding the direct support provided to claimant; district court found that "[t]his is plainly indicative

of a marked limitation" in the domain of Attending and Completing Tasks) (citations to record omitted).

### B.   Interacting and Relating with Others

In the domain of interacting and relating with others, the Commissioner considers the claimant's ability to "initiate and sustain emotional connections with others, develop and use the language of [his] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). By way of illustration, limited functioning in this domain is shown by a claimant's lack of close friends, avoidance or withdrawal from social interaction, overanxiousness or fear of meeting new people or trying new experiences, difficulty playing games or sports with rules, and difficulty communicating with others. See 20 C.F.R. § 416.926a(i)(3).

JB's fourth-grade special education teacher, Ms. Tokaz, found that he had a "very serious problem" occurring hourly in nearly all of the relevant activities in this domain: (1) playing cooperatively with other children; (2) making and keeping friends; (3) seeking attention appropriately; (4) expressing anger appropriately; (5) asking permission appropriately; (6) following rules in all settings; (7) respecting/obeying adults in authority; (8) taking turns in a conversation; and (9) interpreting the meaning of facial expressions, body language, hints, and sarcasm.

T.122. Behavior modification strategies, including time-out for repeated noncompliance and removal from "FunFridays" for repeated disrespect, were necessary. However, praise did not motivate JB, and he was the subject of formal write-ups for his behavioral problems. T.122. Ms. Tokaz expressed "worry about [JB]'s future" as he "has no respect for authority." T.126. Ms. Tokaz noted that JB does "not take redirection of any kind well" and often blames others for his actions. T.124. Interacting with him was a "constant verbal struggle," and his "[p]eers think he is a bully." Id.

Sixth-grade teacher Ms. Killinger's assessment of JB's performance in this domain showed some improvement, although she still found "very serious problems" with seeking attention appropriately and following rules. T.622. JB had a "serious" problem asking permission appropriately. Although he had "obvious" problems playing cooperatively with other children, Ms. Killinger somewhat incongruously found that he had "no problem" making and keeping friends. Ms. Killinger noted "obvious" problems with JB taking turns in a conversation, relating experiences, understanding body language and facial expressions, expressing anger appropriately, and respecting/obeying adults in authority.

The ALJ concluded that JB had a less than marked limitation in this domain, but his cursory analysis simply does not support this finding. The ALJ underplayed JB's oppositional behaviors, characterizing them as a "history of attitude problems" for which

he is receiving counseling. The ALJ noted that there "have been some suspensions" because of what the ALJ calls "behavioral choices". By characterizing JB's limitations in this domain as "behavioral choices", the ALJ erroneously dismissed the medically-recognized symptomatology of Oppositional Defiant Disorder, with which JB has consistently been diagnosed since September 2008.[4]

According to the DSM IV, ODD consists of a "[a] pattern of negativistic, hostile, and defiant behavior lasting at least 6 months, during which four (or more) of the following are present more frequently than is typically observed in individuals of comparable age and developmental level: (1) often loses temper; (2) often argues with adults; (3) often actively defies or refuses to comply with adults' requests or rules; (4) often deliberately annoys people; (5) often blames others for his mistakes or misbehavior; (6) is often touchy or easily annoyed by others; (7) is often angry and resentful; and (8) is often spiteful or vindictive. The reports from JB's mother, teachers, and counselors consistently reflect observations of nearly all of the diagnostic features of ODD.  As he did when assessing the limitations caused

---

[4]
    See, e.g., T.485 (January 13, 2010 DSM-IV-R Diagnosis form); T.289 (September 16, 2008 referral for psychiatric consultation). Although Plaintiff has not raised this issue, the Court finds that the ALJ erred in failing to address whether this impairment, diagnosed consistently by JB's treatment providers, as a "severe" impairment at step two. An argument can be made that because the ALJ found that JB had other severe impairments and continued with the balance of the sequential evaluation, the error in failing to address the ODD diagnosis was harmless. In any event, because this Court finds that reversal is warranted on other grounds, this question need not be resolved. Rice ex rel. T.C.K. v. Astrue, 32 F. Supp.3d 113, 121 (N.D.N.Y. 2012).

by JB's ADHD, the ALJ discounted the validity of JB's diagnosis of ODD by dismissing the symptoms of this behavioral disorder as simply "choices". The ALJ's attempt to downplay the severity JB's oppositional behaviors by characterizing them as "intentional" represents the ALJ attempting to substitute his lay opinion for that of the competent medical professionals who diagnosed JB with ODD in the first place.

The ALJ conceded that JB is "aggressive, destructive, argumentative and disobedient" at home, but concluded that "this [behavior] has improved with ongoing treatment." In support of this statement, the ALJ cited to Exhibits 4F-5F, 7F, 9F, and 18F. As these exhibits amount to a very large portion of the administrative record, this is as unhelpful as citing to nothing at all. Furthermore, the record does not reflect continuous improvement with treatment. For instance, Ex. 18F contains a relatively recent note from Plaintiff to JB's psychiatrist, Dr. Seth Dewey, dated June 16, 2010, explaining that JB was "getting worser [sic]" and that he "got suspended from school . . . for picking at an autistic boy[,] throwing things at him and hitting him." T.611. See also T.534. Plaintiff said he was "still talking back, lying [and] getting loud with her," and "refus[ing] to bathe." T.611.

After reviewing the record in its entirety, the Court finds that the ALJ's assessment of a "less than marked" limitation in this domain was not supported by "substantial evidence" because the

ALJ "cherry picked" the evidence in favor of a finding of no disability while ignoring other probative and consistent evidence of disability. See, e.g., Castano v. Astrue, 650 F. Supp.2d 270, 278 (E.D.N.Y. 2009) (finding error where the ALJ and the Commissioner "rel[ied] on an often-used but dubious argumentative technique of selecting the facts that tend against a finding of disability, however attenuated, while ignoring the key test results that are consistent with a finding of disability"); Backus v. Astrue, No. 3:05-CV-1180(NAM), 2008 WL 4519006, at *16 (N.D.N.Y. Sept. 29, 2008) ("The ALJ may not 'pick and choose' excerpts of medical reports that support a denial of benefits and cannot ignore aspects of a medical opinion that are favorable to a plaintiff.") (citing Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983); other citation omitted). The Court finds that, contrary to the ALJ's assessment, the record demonstrates at least a "marked" limitation in JB's ability to appropriately interact with, and relate to, others. See, e.g., Rice ex rel. T.C.K., 32 F. Supp.3d at 124-25 (marked limitation in domain of Interacting and Relating to Others where claimant was frequently involved with negative peer interactions, including bullying and was disciplined for taking other students' property, fighting, threatening a bus driver, and inappropriate physical contact).

## C. Caring for Self

Because the Court already has found that JB has "marked"

limitations in two other domains, it need not consider whether he has a limitation in the third domain of Caring for Self; a finding of marked limitations in two domains qualifies him as disabled under the Commissioner's regulations. See 20 C.F.R. § 416.926a(d). Nevertheless, in the interest of completeness, the Court addresses Plaintiff's argument regarding the ALJ's analysis of this domain.

The Caring for Self domain considers how well a child maintains a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways; how he copes with stress and changes in his environment; and whether he takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k). A school-age child should be independent in most day-to-day activities, (e.g, dressing and bathing oneself, although he "may still need to be reminded sometimes to do these routinely"). 20 C.F.R. § 416.926a(k)(2)(iv). A school-age child "should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior"; "should begin to demonstrate consistent control over [his] behavior"; and "should be able to avoid behaviors that are unsafe or otherwise not good for [him]". Id.

The ALJ found a "less than marked" limitation in this domain. The ALJ's analysis consists of only two sentences, in which he again improperly discounted the severity of JB's limitations in

this domain by labeling them as "choices": According to the ALJ, JB simply "does not always *choose* to maintain appropriate behavior." T.27 (emphasis supplied). However, the regulations state that an "[i]mpaired ability in this area [of Caring for Self] is manifested by *failure* to take care of these needs or by self-injurious actions." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C)(2)(c) (emphasis supplied). Thus, the ALJ's discounting of what he perceived to be JB's "choices" reflects a misapplication of the Commissioner's regulations.

Furthermore, the ALJ did not analyze the substantial evidence in the record regarding JB's impairments in multiple self-care areas—namely, his appetite disturbance, stealing and hoarding of food, obesity, and serious personal hygiene problems. For instance, on February 9, 2010, JB was still failing to maintain personal hygiene, and his mother had decided to "let him deal with the consequences" of having his peers talk about him. T.482. He was taking Strattera for his ADHD and ODD without any side effects, but he was not completing his school work, and was not listening or sitting down on the bus. His teachers were allowing him to complete his homework in school. He was grossly overweight. A treatment plan review on March 3, 2010, noted that JB had regressed and was not doing well at home or in school. T.200. He continued to gain weight, though the doctor stated it was not due to his medication. On April 2, 2010, his personal hygiene was noted to be worse.

T.498. On June 24, 2010, it was noted that JB had gained 10 pounds, and his mother was going to lock the refrigerator and kitchen in an attempt to keep him from stealing and hoarding food. T.534. Notes from September 6, 2010, and December 2, 2010, indicate that JB continued to gain weight and ignore his personal hygiene. T.563, 576.

JB's teachers' assessments support these reports of very serious limitations in the domain of Caring for Self. JB's fourth-grade special education teacher, Ms. Tokaz, indicated in April 2009, that he had a "very serious problem" handling frustration appropriately, being patient when necessary, identifying and appropriately asserting emotional needs, calming himself or otherwise responding appropriately to mood changes, using appropriate coping skills to meet the daily demands of school, and knowing when to ask for help. T.124. Ms. Killinger, in February 2011, noted that JB had a "very serious problem" in being able to take care of physical needs (e.g., dressing and eating), and had "obvious" problems with personal hygiene, taking his medications, and being patient when necessary. T.624.

Based on the ALJ's abbreviated analysis of JB's limitations in this domain, and his generic citation to large portions of the record, the Court is unable to say that the ALJ fulfilled his duty to consider all of the relevant evidence. To the contrary, the record contains substantial evidence of a "marked" limitation in

the domain of Caring for Self.

## VI.  Remedy

Sentence four of 42 U.S.C. § 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). After reviewing the record in its entirety, the Court concludes that remand to the Commissioner for further proceedings "would serve no productive purpose, would not produce findings contrary to this Court's conclusions, and would only cause further delay." Perkins, 32 F. Supp.2d at 344. The ALJ in this case had access to the full record, and his determination that JB did not have "marked" limitation in two domains of functioning was legally flawed in multiple ways and unsupported by the record. To remand the case for further consideration would be futile, as the only conclusion supported by the record evidence is that JB suffers a marked limitation in at least two domains, and is therefore disabled pursuant to the Commissioner's regulations. See 20 C.F.R. §§ 416.926a(d). The Court also is mindful of the length of the time Plaintiff's application for SSI on behalf of JB has been pending. Delay "is harmful for any litigant, but particularly in connection with benefits for children, which are not to replace lost income, but to enable low-income families to afford special education, medical treatment, physical rehabilitation, early intervention services, and personal needs assistance for the child." Nieves ex

rel. Nieves v. Barnhart, No. 02 Civ.9207, 2004 WL 2569488, at *10 (S.D.N.Y. Nov. 12, 2004) (citing Maldonado v. Apfel, 55 F. Supp.2d 296, 297-98 (S.D.N.Y. 1999)).

## VII. Conclusion

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings is granted insofar as the Commissioner's decision denying benefits is reversed, and the matter is remanded to the Commissioner solely for the calculation and payment of benefits. The Commissioner's motion for judgment on the pleadings is denied. The Clerk of the Court is requested to close this case.

**SO ORDERED.**

S/ Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    Rochester, New York
          April 14, 2015